UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -
DANIEL BROWN,

                      Plaintiff,

       -v-                                    5:21-CV-1018

BRIAN P. MAHER; JOHN SNYDER;
and MARGARET
MONTFORT-BALFOUR,

                      Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

APPEARANCES:                          OF COUNSEL:

LEGAL SERVICES OF CENTRAL             JOSHUA T. COTTER, ESQ.
    NEW YORK-SYRACUSE
Attorneys for Plaintiff
221 S. Warren Street, Suite 300
Syracuse, New York 13202

HON. LETITIA JAMES                    MELISSA A. LATINO, ESQ.
Attorney General for the State        Assistant Attorney General
    of New York
Attorneys for Defendants
The Capitol
Albany, New York 12224

DAVID N. HURD
United States District Judge

## <u>MEMORANDUM-DECISION AND ORDER</u>

## I. <u>INTRODUCTION</u>

   On September 16, 2021, plaintiff Daniel Brown ("Brown" or "plaintiff")

filed a complaint against three defendants: Brian P. Maher ("Maher"),

plaintiff's parole officer; John Snyder ("Snyder"), plaintiff's Senior Parole Officer; and Margaret Monfort-Balfour, the Bureau Chief of the Syracuse area parole office (together "defendants").  Defendants are parole officers of varying authority tasked with supervising plaintiff in the community after he served a sentence in New York State prison.

On March 7, 2022, Brown filed a motion for a preliminary injunction (his second in this case) under Federal Rule of Civil Procedure ("Rule") 65. Essentially, plaintiff asks to preliminarily enjoin defendants from finding him in violation of his parole if he moves in with his new wife, Mariam Saleh ("Saleh") and her three children, now his stepchildren.  That motion, having been fully briefed, will now be decided on the submissions and without oral argument.

## II. BACKGROUND

In March of 2016, Brown was arrested for having a two-month-long sexual relationship with a fifteen or sixteen-year-old girl.[1]  Dkt. 22-2 ("Pl. Aff."),[2] ¶ 5; Dkt. 22-5, p. 4.[3]  At the time of the relationship, plaintiff was about twenty-nine years of age.  Dkt. 22-5, p. 4 (document dated June 3, 2019 describing plaintiff as thirty-two years old).  Plaintiff ultimately pled guilty to

---

[1] Plaintiff claims that she was sixteen, Pl. Aff. ¶ 5, but his case summary describes her as fifteen. Dkt. 22-5, p. 4.

[2] Docket number 22-2 contains three exhibits, each one an affidavit.  The Court will use shorthand designations to clear up which affidavit it refers to with each motion.

[3] Pagination corresponds with CM/ECF.

Rape in the Third Degree and Criminal Sexual Act in the Third Degree on December 5, 2016, for which he was sentenced to two years' imprisonment to be followed by ten years of post-release supervision. *Id.* Plaintiff was released into society—subject to parole's supervision—on August 29, 2019. Dkt. 24-1 ("Rigby Aff."), ¶ 8. Plaintiff's term of supervision is scheduled to end on September 2, 2029. Dkt. 22-5, p. 4.

As one of the conditions of his parole, Brown was designated as a sex offender. Dkt. 22-5, p. 2. To that end, he was evaluated for the potential risk he would pose upon release and found to be a Level I (Low) risk offender. *Id.* Even so, plaintiff claims that his first parole officer, P.O. Miller ("Miller") told him that, as a sex offender, his rights would still be carefully circumscribed. Pl. Aff. ¶ 10.

Brown's parole conditions immediately posed a problem for his personal life. That is because plaintiff began dating Saleh right before he went to prison. Pl. Aff. ¶ 6. Saleh herself has three children: a pair of twins (one boy and one girl) who were nine years old when plaintiff first filed his claim and a girl who was twelve years of age. Dkt. 22-2 ("Saleh Aff."), ¶ 2.

Apparently, Brown spoke to Miller not long after his release about what he could do to get permission to visit with the children in his life, including Saleh's. Pl. Aff. ¶ 12. Miller apparently responded that he would need to attend counseling and come up with a safety plan with his counselor for any

visits with children.  *Id.*  Plaintiff drafted a plan, got it signed by all necessary parties, and provided Miller with a proposal.  *See id.*; Dkt. 22-5, pp. 7-9.  Plaintiff claims that Miller approved of the plan and permitted plaintiff to have supervised visits with Saleh's children.  Pl. Aff. ¶ 13.

Brown alleges that he began visiting Saleh's children for Thanksgiving in 2019.  Pl. Aff. ¶ 14.  Apparently, the visit went well, and after that auspicious start plaintiff spent a lot of time with Saleh and her children in the following months.  *Id.* ¶ 15.

In July of 2020, Brown asked Saleh to marry him.  Pl. Aff. ¶ 16.  They set their wedding date for October 9, 2021, with a rehearsal dinner scheduled for October 8, 2021.  *Id.* ¶¶ 16, 18.  Saleh's children were intended to be involved in the wedding.  Saleh Aff. ¶ 14.  Initially, however, it appeared as though defendants would prevent the children from participating in—or even being present for—the ceremony and its attendant festivities.  Pl. Aff. ¶ 23.

On September 16, 2021, Brown filed a complaint in this district alleging that defendants' restriction on his ability to spend time with Saleh's children amounted to a violation of his due process rights under § 1983.  Dkt. 1.  To that end, plaintiff pursued injunctive relief under *Ex parte Young*, 209 U.S. 123 (1908), to prevent defendants' supervised release conditions from interfering with his relationship with Saleh and her children.  *See generally*, Dkt. 1, *passim.*

With his complaint, Brown moved for a temporary restraining order and a preliminary injunction under Rule 65—both aimed at allowing Saleh's children to attend and participate in the wedding.  Dkt. 2.  Apparently, the litigation alone was enough to bring both parties to the table, and plaintiff and defendants signed a stipulation on October 5, 2021, resolving the initial dispute and allowing Saleh's children to attend and participate in the wedding and rehearsal dinner.  Dkt. 12.

But while the stipulation put an end to the immediate problem of Brown's ability to share his wedding day with his stepchildren, it did nothing at all to resolve the larger issues of how his and Saleh's marriage would work going forward.

As it stands, Brown's parole conditions prohibit him from contacting any person under the age of eighteen, and by extension prevent him from living with Saleh and his stepchildren.  Dkt. 22-7 ("Pl. Supp. Aff."), ¶ 3.  Both plaintiff and Saleh claim that this restriction has caused: (1) a financial toll by requiring that they maintain separate households; (2) emotional distress by separating plaintiff and his wife; (3) Saleh's children to be deprived of a father figure by omitting plaintiff from their lives; and (4) plaintiff and Saleh's desire to have another child together to be effectively impossible. Pl. Supp. Aff. ¶¶ 4-7; Dkt. 22-7 ("Saleh Supp. Aff."), ¶¶ 4-8.

On March 7, 2022, Brown filed a second motion for a preliminary injunction allowing him to live with Saleh and his stepchildren.  Dkt. 22.  On March 28, 2022, defendants opposed plaintiff's motion, Dkt. 24, relying chiefly on the opinion of plaintiff's therapist, Alice Nowark ("Nowark"), who takes the position that she would never "support, recommend, or approve" that any sex offender reside with non-biologically related minors.  Dkt. 25-5, p. 2.  This decision now follows.

## III. <u>LEGAL STANDARD</u>

The Second Circuit requires a plaintiff seeking a preliminary injunction to prove four elements:

> (1) a likelihood of irreparable harm; (2) either a likelihood of success on the merits or sufficiently serious questions as to the merits plus a balance of hardships that tips decidedly in [the movant's] favor; (3) that the balance of hardships tips in [the movant's] favor regardless of the likelihood of success; and (4) that an injunction is in the public interest.[4]

*Chobani, LLC v. Dannon Co.*, 157 F. Supp. 3d 190, 199 (N.D.N.Y. 2016) (analyzing changes to Second Circuit preliminary injunction standard and comparing existing standards).  The movant must make a "clear showing" that each of these elements is met.  *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008).

---

[4] The Second Circuit appears to still be in the process of formally harmonizing its prior existing standards with the four-element test required by the Supreme Court in *Winter*, 555 U.S. at 20.

If a movant's desired injunction would alter, rather than preserve, the status quo, that injunction is mandatory in nature and subject to heightened scrutiny. *Yang v. Kosinski*, 960 F.3d 119, 127-28 (2d Cir. 2020). To satisfy that heightened burden, the movant must make a "strong" showing of irreparable harm and demonstrate a "clear or substantial likelihood of success on the merits." *Id.* at 128.

## IV. **DISCUSSION**

### A. **Likelihood of Success on the Merits**

Functionally, Brown brings a § 1983 due process claim, but because he is suing all three defendants in their official—rather than personal—capacities, he first has to clear the gatekeeping requirements of *Ex parte Young*. 209 U.S. 123.

A plaintiff states an *Ex parte Young* claim if he "alleges an ongoing violation of federal law and seeks relief properly characterized as prospective." *Va. Office for Prot. & Advoc. v. Stewart*, 563 U.S. 247, 255 (2011). Brown meets that requirement. Plaintiff alleges that defendants' parole provisions bar him from living with his wife without any support for the notion that he poses a danger, which in turn denies him his rights to due process. He also alleges that that violation is continuing, and he wants prospective relief in the form of an injunction barring defendants from returning him to prison for spending time with his family. By extension, the

requirements of *Ex parte Young* do not meaningfully undermine plaintiff's likelihood of success.

Instead, all that matters is Brown's likelihood of success on his underlying due process claim.[5]  To that end, a plaintiff looking to vindicate his due process rights must prove: (1) a deprivation of a life, liberty, or property interest; and (2) that the procedures followed by the State in making that deprivation were not "constitutionally sufficient."  *See Victory v. Pataki*, 814 F.3d 47, 59 (2d Cir. 2016).

"Parolees are, of course, not without constitutional rights," *United States ex rel. Sperling v. Fitzpatrick*, 426 F.2d 1161, 1164 (2d Cir. 1970), but even so their liberty is contingent on their observing special parole restrictions, *Morrissey v. Brewer*, 408 U.S. 471, 482 (1972).  In the Second Circuit, "parolees are entitled to some form of due process in the imposition of special conditions of parole."  *Singleton v. Doe*, 210 F. Supp. 3d 359, 373 (E.D.N.Y. 2016).

And as might be expected, "freedom of personal choice in matters of marriage and family life is one of the liberties protected by the Due Process

---

[5] Courts routinely construe injunctions looking to prevent government action as prohibitive injunctions, not mandatory ones.  *See, e.g.*, *Mastrovincenzo v. City of N.Y.*, 435 F.3d 78, 89-90 (2d Cir. 2006) (noting that mandatory injunctions require compulsion to act and prohibiting government from enforcing previously promulgated regulation is not mandatory); *see also Marquez v. Annucci*, 2020 WL 3871362, at *5 (S.D.N.Y. July 9, 2020) (same for parole conditions).  So plaintiff need only make the lesser showing of a probability of success to prove entitlement to a preliminary injunction rather than the heightened showing of a clear probability he would have been tasked with had his injunction been mandatory.

Clause of the Fourteenth Amendment." *Cleveland Bd. of Educ. v. LaFleur*, 414 U.S. 632, 639-40 (1974).  If the state deprives a plaintiff of that liberty interest without meeting the requisite level of constitutional scrutiny, his due process rights are violated.  *See United States v. Myers*, 426 F.3d 117, 125-26 (2d Cir. 2005)  Courts in this Circuit have held that a parolee's right to live with his spouse is a fundamental right, and any parole condition impeding that right must withstand strict scrutiny.  *See, e.g.*, *Marquez*, 2020 WL 3871362, at *6 (applying strict scrutiny to parole condition that would prevent husband and wife from living together).[6]

A government action only passes through strict scrutiny unmolested if it is "narrowly tailored to serve a compelling government interest." *Myers*, 426 F.3d at 126.  In other words, the government must demonstrate that "alternative measures . . . would fail to achieve the government's interests, not simply that the chosen route was easier." *Agudath Israel of Am. v. Cuomo*, 983 F.3d 620, 633 (2d Cir. 2020).

Brown principally argues that strict scrutiny should apply to his liberty interest in living with his wife.[7]  To his point, that relationship involves

---

[6] The Second Circuit applies a sliding scale based on the degree of kinship, with the right to associate with parents, siblings, spouses, and children receiving the most protection. *Patel v. Searles*, 305 F.3d 130, 136 (2d Cir. 2002).  In other cases, courts must consider factors such as "cohabitation and the precise degree of kinship." *Id.*

[7] Crucially, plaintiff does not invoke a liberty interest in living with his stepchildren, and is willing to accept parole conditions designed to keep the children safe.  For example, Saleh submitted a second supplemental affidavit suggesting an amended condition requiring her or another adult to be present every time both plaintiff and her stepchildren are home.  Dkt. 26-1, ¶ 6.

choices about family life, which the Supreme Court has recognized as rights "of basic importance." *M.L.B. v. S.L.J.*, 519 U.S. 102, 116 (1996). And certainly other courts in this district have applied strict scrutiny to regulations prohibiting a husband from living with his wife. *Marquez*, 2020 WL 3871362, at *6.

What is more, defendants themselves acknowledge that Supreme Court precedent seems to compel strict scrutiny as the relevant standard for the rights that Brown puts at issue in this case. *See Smith v. Org. of Foster Families for Equal. & Reform*, 431 U.S. 816, 843 (1977) ("[B]iological relationships are not [the] exclusive determination of the existence of a family. The basic foundation of the family in our society, the marriage relationship, is of course not a matter of blood relation. Yet its importance has been strongly emphasized in our cases."). Therefore, plaintiff's right to live with his wife is a fundamental one. Defendants' restriction must therefore survive strict scrutiny.

To that end, there can be no doubt that defendants' interest in protecting children from sexual abuse is a compelling one. The only question is whether there is a strong likelihood that defendants will not be able to prove that their measures to protect that interest in the unique circumstances of this case are narrowly tailored.

At this early stage, the lofty standard defendants are faced with practically answers the question by itself.  Defendants' position—informed by Nowark's letter—is that Brown would always be a danger to the stepchildren if he lived with Saleh and there would be no possible mechanism to adequately protect the children while allowing plaintiff to live with his family.  Dkt. 25-5, p. 2.  That broad, hardline stance is difficult indeed to square with the high burden strict scrutiny imposes.  *See Evergreen Ass'n, Inc. v. City of N.Y.*, 740 F.3d 233, 246 (2d Cir. 2014) (noting that, though not insurmountable, strict scrutiny imposes a "heavy burden").

There are, no doubt, many cases where a convicted sex offender should never be permitted to live with children to whom he is not biologically related.  Indeed, that may very well be the typical case.  And certainly, if the applicable standard were the far more deferential rational basis review, the portrait of necessity defendants paint would suffice, even given the broad brush they use to convey the image.  *See Romero v. Pataki*, 241 F. App'x 764, 766 (2d Cir. 2007) (summary order) (citing *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 440 (1985) for proposition that government action reviewed for rational basis will be upheld if reasonably related to legitimate state interest).

But strict scrutiny tasks a government entity with proving that there are simply no other, less restrictive options to achieve its goals.  *See Agudath,*

983 F.3d at 633. On the facts of this case, defendants have failed to do so. Rather, they are content to rely on Brown's status as a sex offender to carry the day. Indeed, even Nowark's letter goes no further than that baseline detail. Dkt. 25-5, p. 2 (explaining that Nowark would never approve any sex offender to reside with any non-biologically related minor).

Defendants' difficulties are only exacerbated by the unique complexities of Brown's case. First, Saleh, the parent of the children defendants claim to be at risk, is actively advocating for plaintiff to be able to live in the same home as her and her children. *See generally* Saleh Supp. Aff., *passim*. Second, plaintiff's sex offense involved a two-month sexual relationship with a teenage girl, which plaintiff has actively repented. Dkt. 22-5, p. 4. Third, plaintiff has participated in treatment for his sex offense. Pl. Aff. ¶ 12. Nowark's letter itself notes that recidivism among treated sex offenders is "statistically low." Dkt. 25-5.

Based on the evidence presented by the plaintiff at this early stage, it appears that it will be difficult for defendants to prove that there is no possible less-restrictive alternative to prohibiting Brown from living with his wife Saleh and her children. *Agudath*, 983 F.3d at 633. This is all the more clear because the lynchpin to defendants' argument is Nowark's letter, which appears not to contemplate plaintiff's unique case, and indeed is written as if Nowark did not even know which patient she was writing about. *See*

Dkt. 25-5, p. 2 (describing letter as "written response to . . . question about whether or not a treated sex offender should reside with non-biological, minor children"); *see also Doe v. Lima*, 270 F. Supp. 3d 684, 701-10 (S.D.N.Y. 2017) (rejecting wholesale ban on parolee sex offender from seeing family member where parole officers failed to use any individualized evidence to consider risks to family member).

As a result, Brown has established a high likelihood of success on the merits, and this factor cuts in favor of preliminary injunctive relief.

### B. Likelihood of Irreparable Harm

A preliminary injunction is an extraordinary remedy, and the chief tool that courts use to make sure it stays that way is by requiring a "concrete showing of imminent irreparable injury." *Benaroya v. Nationwide Mut. Ins. Co.*, 2020 WL 1863287, at *5 (E.D.N.Y. Jan. 22, 2020). In other words, an injury that can adequately be compensated through a money judgment is usually not enough to call for a preliminary injunction. *Borey v. Nat'l Union Fire Ins. Co.*, 934 F.2d 30, 34 (2d Cir. 1991).

In the Second Circuit, an "alleged violation of a constitutional right triggers a finding of irreparable injury." *Conn. Dep't of Env't Prot. v. O.S.H.A.*, 356 F.3d 226, 231 (2d Cir. 2004) (internal citation omitted). As a result, Brown's alleged due process violation more or less collapses the likelihood of success and likelihood of irreparable harm inquiries. Plaintiff

13

has alleged a due process violation, so the presumption is that he has alleged a likelihood of irreparable harm.

But even setting aside Brown's claimed constitutional violation, he has also established irreparable harm along an entirely separate avenue. Plaintiff and Saleh claim that they wish to have a biological child together and that their ages—thirty-five and thirty-nine, respectively—make time of the essence in that pursuit.  Pl. Supp. Aff. ¶ 7; Saleh Supp. Aff. ¶ 8.  They also both claim that doing so would interfere with plaintiff's ability to participate in raising his child.  Pl. Supp. Aff. ¶ 7; Saleh Supp. Aff. ¶ 9.

Even if Brown were to prevail at trial, that process could—and likely would—take years.  Thus, in addition to the irreparable harm plaintiff alleges due to his claimed constitutional violation, there is a high likelihood that even if he were to prevail at trial, Saleh would be unable to conceive by the time that he did.  Plaintiff has therefore amply established an irreparable harm.

## C. **Balance of the Equities and Public Interest**

The balance of the equities functions much like one would expect it to: courts weigh the relative harm to the parties of granting or denying the injunction, and this factor cuts in favor of whoever would experience the greater harm.  *See Winter*, 555 U.S. at 28-31 (comparing harm to United

States Navy of being required to quickly change training methodologies with harm to environment in granting injunction).

The public interest question does not look much different from the balance of the equities, except the scope is expanded to consider what would be best for society as a whole. *See Winter*, 555 U.S. at 29-31 (considering national security concerns of granting plaintiff's injunctions against Navy training). In any case, the balance of the equities and the public interest merge into a single inquiry when the government is involved in a dispute over a preliminary injunction. *Nken v. Holder*, 556 U.S. 418, 435 (2009).

The equitable question is by far the closest, and the one that gives the most pause. On the one hand, the potency of Brown's interest in living with his wife cannot be understated. On the other, defendants, as arms of the State, have a powerful interest in ensuring that children are protected from sexual predators.

In most cases, it would be impossible to determine which interest prevails on a cold record without a hearing, or at least oral argument. But this is a special case. Brown has pulled no punches in illustrating the force of his wish to be there for Saleh while submitting evidence mitigating the likelihood that he would reoffend if permitted to do so. The contours of plaintiff's interests in living with his wife have been evaluated extensively above and

need not be repeated here.  Instead, the parties' respective showings of the

danger plaintiff poses to Saleh's children will be considered.

Brown has never obfuscated or minimized the gravity of his offense.  *See*

Dkt. 22-5, p. 4 (plaintiff being interviewed concerning offense and stating

that he felt "horrible" about offense, acknowledges that it was wrong, and

expressing "extreme" regret for how offense affected victim and her family).

Plaintiff has consistently taken responsibility for his offense.

Pl. Supp. Aff. ¶ 9 (describing his "life before and while committing [ ]his crime

[ ]as one of selfishness and irresponsibility").  Nevertheless, plaintiff

successfully completed sex-offender treatment programs while in prison.

Dkt. 22-5, p. 5.  Upon release, he was assessed as having a low risk of

reoffending.  *Id.*

Brown completed a course of group therapy with Nowark once he was out

of prison.  *See* Dkt. 22-6, p. 10.  According to Nowark, plaintiff "has

acknowledged and accepted personal responsibility for his offense," "has

actively changed the distorted thinking which supported his choice to offend,"

and has "demonstrate[d] motivation and commitment to recovery and to

remaining offense free."  *Id.*  Perhaps in part due to his treatment, plaintiff

has never received even one parole violation in two-and-a-half years.

Pl. Supp. Aff. ¶ 8; Rigby Aff. ¶ 8.

16

Saleh, the mother and wife, herself has been adamant that she would never permit Brown to harm her children.  Saleh Aff. ¶ 16.  On the contrary, she said in a letter to defendants in advance of this litigation that "if [plaintiff] ever laid a finger on one of [her] children, returning to prison would be a walk in the park compared to what [she] may do to him."  Dkt. 22-6, p. 4.  She nevertheless made clear that she does not anticipate that that would ever come to pass.  Saleh describes plaintiff's relationship with her children as having a profoundly positive effect in that he has given them a much-needed father figure.  Saleh Aff. ¶ 16.

When compared to Brown's extensive and highly individualized showing that he, in this particular case, poses little to no danger to Saleh's children, defendants response leaves much to be desired.  Defendants rely exclusively on two novel pieces of evidence: (1) the affidavit of Paul Rigby ("Rigby"), defendants Maher and Snyder's supervisor; and (2) the Nowark letter.  None of the defendants in the caption submitted an affidavit in opposition to plaintiff's motion.

Both pieces of evidence fall far short of establishing that the public interest tips in defendants' favor.  For Rigby's part, his affidavit begins by pointing out that Brown is a registered sex offender, and that the restrictions placed upon him are not atypical.  Rigby Aff. ¶¶ 7-14, 20-24.  Both points are true, but neither helps the assessment of whether plaintiff actually poses a

17

risk to his stepchildren to justify the intrusion on his ability to live with his wife.

Next, Rigby's affidavit explains that Brown was aware of these conditions at the time that he married Saleh.[8]  Rigby Aff. ¶ 18.  Again, that is obvious enough, but the issue is not whether plaintiff was forewarned about these conditions, but whether those conditions serve the public interest.  *See Winter*, 555 U.S. at 29-31.  Nor could knowledge of a parole condition by itself ever invalidate a constitutional challenge to that condition.  Imposing that requirement would prohibit any parolee from ever challenging the constitutionality of a parole condition provided that he was aware of it ahead of time.

Rigby points out that it is "conceivable" that Brown and Saleh conspired together to enter into a marriage so that plaintiff could circumvent his parole conditions and abuse Saleh's daughters with her help.  Rigby Aff. ¶¶ 33-34. The capacity for parents to be accomplices or even participants in the sexual abuse of their children is well known.  *See, e.g.*, *McClane v. Superintendent of the Corr. Facility*, 2007 WL 295599, at *1 (E.D.N.Y. Jan. 24, 2007) (describing father's sexual abuse of daughter).  However, Rigby's vague and entirely unsupported claim that it is "conceivable" that Saleh would acquiesce to that

---

[8] If plaintiff had applied to live with Saleh and her children *before* they were married, that application clearly would have been summarily rejected.

is clearly not enough to raise a concern that Saleh's children would be in danger.  Rigby Aff. ¶¶ 33-34.  All the more so because Saleh herself has expressed vehement opposition to anything of the sort.  Dkt. 22-6, p. 4.

That leaves two final scraps of information in Rigby's affidavit left to be considered.  First, Rigby correctly points out that Brown's initial offense involved "grooming" an adolescent girl into a sexual relationship, and that Saleh's daughters are approaching the age of plaintiff's victim. Rigby Aff. ¶¶ 17, 31.

This point, at last, is well-taken.  There is always a potential risk that a plaintiff could reoffend, including in cases involving sex offenses.  *See, Doe v. Pataki*, 120 F.3d 1263, 1266 (2d Cir. 1997) (discussing some evidence to support higher rates of recidivism among sex offenders).  Nevertheless, that risk is muted on these particular facts based on Nowark's own claim that Brown has meaningfully addressed the behavior that led him to offend in the first place.  Dkt. 22-6, p. 10.

Further, as Brown correctly counters, courts have found parole conditions which separate a parolee from a member of their family based only on their crime of conviction cannot withstand strict scrutiny.  *See, e.g.*, *Lima*, 270 F. Supp. 3d at 703-10 (striking down parole condition that excluded parolee father from seeing son based only on crime of conviction without considering particular circumstances of case).

19

Second, Rigby's affidavit legitimately states that on one occasion, Brown apparently misrepresented to his parole officers that Saleh's parents were going to supervise a visit between plaintiff and Saleh's children. Rigby Aff. ¶ 43.  When defendant Maher followed up with Saleh's parents, however, they were unaware of this visit.  *Id.*  This fact also cuts against plaintiff's honesty and trustworthiness in a vacuum.  However, the weight of that claim is diminished significantly by Saleh's second supplemental affidavit, which claims that the incident was entirely a misunderstanding because Saleh had not had time to talk to her parents about a routine visit before plaintiff's parole officers had called.  Dkt. 26-1, ¶¶ 3-4.

Finally, defendants again rely heavily on Nowark's letter.  The Court has already expressed its frustration with that document and will not belabor the point here.  Suffice to say that what appears to be a form letter which makes no reference to Brown or the unique conditions of this case—and which does not sit comfortably alongside Nowark's other, much more specific assessment of plaintiff's risks of reoffending—does little to establish a likelihood that plaintiff living with Saleh would pose a risk to her children.  *Compare* Dkt. 25-5, p. 2 (disavowing any possible approval for sex offender cohabiting with non-biologically-related children), *with* Dkt. 22-6, p. 10 (describing plaintiff's positive experiences with treatment and low likelihood to reoffend).

Brown has levied abundant evidence that he could be a positive influence on Saleh's children and that he has a strong interest in living with his wife. He has also provided substantial support for the notion that the risk that he would reoffend and harm Saleh's children is very slight.  Against that showing, defendants have retorted only that plaintiff is a sex offender and that as such there is an abstract risk that he would reoffend.  Finally, defendants have asserted that they will not work with him in any way to find an appropriate compromise.

In other words, Brown's showing that the public interest is in his favor is stronger—to say the least—than defendants' opposition.  All three relevant factors in play in considering a motion for a preliminary injunction cut in his favor.  Plaintiff's motion for a preliminary injunction must be granted.  *See, e.g.*, *Marquez*, 2020 WL 3871362, at *6-7 (finding that public interest in rehabilitating married parolees favored permitting them to live together and granting preliminary injunction notwithstanding typical condition of parole prohibiting parolees from associating with other convicted felons).

## V. <u>CONCLUSION</u>

Defendants are charged with protecting the public from convicts, including—and perhaps especially—those convicted of sex offenses.  As a result, the present motion practice must be approached by all with grave caution.  The obligation to protect the public and serve justice must be

undertaken with the utmost seriousness.  However, defendants' efforts to achieve those noble goals are somewhat perplexing.

Given the strength of Brown's showing that his risks of recidivism were miniscule, defendants—in opposing his motion—were obliged to convince the Court that plaintiff posed a substantial danger to Saleh's children that could not be alleviated while he lives under the same roof.  The onus was on them to rebut with evidence and arguments establishing both the danger of harm and the impossibility of avoiding that harm through any means other than a blanket prohibition on plaintiff living with his own wife and, by extension, his stepchildren.  They have failed.

Defendants largely tried to meet their burden with conclusory, unsupported allegations boiling down to a claim that simply because Brown is a sex offender, he will always pose a danger, and nothing could possibly be done to reduce that risk.  Defendants' engagement with the pieces of ameliorative evidence or the novel circumstances of plaintiff's case was, to say the very least, minimal.  That simply cannot be enough to overcome plaintiff's showing.

In other words, any evidence on this record demonstrating that Brown poses a danger to Saleh's children is remote indeed.  In the unlikely event that reality proves otherwise, defendants should think long and hard about their bare minimum approach to this case, and how their failure to effectively

rebut plaintiff's showing left no choice but to grant plaintiff's motion for a preliminary injunction.

In any case, this decision should not be read so as to otherwise circumscribe defendants' ability to supervise and monitor Brown. He has asked for a preliminary injunction permitting him to live with his wife and her children, his stepchildren, while this case moves toward resolution. That request is granted. Any other safety measures which defendants deem appropriate are in no way constrained by this order.

Therefore, it is

ORDERED that

1. Plaintiff Daniel Brown's Motion for a Preliminary Injunction is GRANTED;

2. Defendants are prohibited from enforcing the parole condition that prohibits plaintiff Daniel Brown from having contact with any person under the age of eighteen without written permission from his parole officer, but only insofar as that prohibition prevents him from living in the same house as his wife Mariam Saleh and her children, his stepchildren; and

3. Plaintiff Daniel Brown may live in the same house as wife Mariam Saleh and her children, his stepchildren, provided that parole approve

of the housing as compliant with the requirements of the Sexual

Assault Reform Act.

IT IS SO ORDERED.

Dated:  April 6, 2022
       Utica, New York.

David N. Hurd
U.S. District Judge